HAGAN v. TUCKER'S EX'X.

(District Court, E. D. Pennsylvania. December 26, 1901.)

1. SHIPPING—DEMURRAGE—DELAY IN PRESENTING CLAIM.

Where libelant furnished barges for the use of respondent's testator in transporting coal under a general arrangement by which bills for such services were presented and paid monthly, a claim for demurrage on account of the detention of a barge will not be allowed when not presented until after the death of the testator and more than a year after the service was rendered and the bill therefor paid, in which no such claim was made, although such claim was warranted by the terms of the bill of lading.

2. SAME—EVIDENCE CONSIDERED.

Respondent's testator was engaged in mining and selling coal, largely marketed in Philadelphia, and in the conduct of his business there he employed barges of libelant in lighterage service. Later he extended his business to New York, and on his promise, which was kept, to give libelant his own lighterage business there, and such other as he could influence, libelant sent a number of barges to New York. In the usual course of trade there, coal intended for steamships lies in barges at a wharf awaiting transfer or sale, and some of libelant's barges so employed by decedent were delayed before the coal was delivered, which was a usual and necessary circumstance in the business. Monthly bills for the use of the barges were presented and paid, no claim being made therein on account of such delays. Neither did the bills of lading used make provision for such payment. After decedent's death, libelant made a large claim for damages on account of such delays. *Held* that, in the absence of clear evidence of a contract to pay for such detention, it must be presumed that libelant assumed the risk of such delays as a known incident of the employment, and that he was not entitled to recover.[1]

In Admiralty. Action to recover demurrage and damages for unreasonable detention of coal barges.

John A. Toomey and Henry R. Edmunds, for libelant.

M. Hampton Todd, for respondent.

J. B. McPHERSON, District Judge. During the period from December, 1897, to May, 1899, the libelant was the owner of eight barges that were employed in carrying coal for Alfred Tucker (doing business under the firm name of Alfred Tucker & Co.) from South Amboy to other points in the harbor of New York. Some of the coal was consigned from South Amboy directly to the purchasers, but a large proportion of it went to Morris street wharf in Jersey City, where it lay in the barges, awaiting delivery to steamships. Alfred Tucker was a miner and shipper of bituminous coal, and much of the product of his mines was carried by the Pennsylvania Railroad to its coal terminals at South Amboy. He had been shipping coal from Philadelphia for a number of years before December, 1897, and during these years much of his lighterage business upon the Delaware river was done by the libelant. Desiring to extend his trade to the city of New York, Mr. Tucker proposed to the libelant to send to that city some of his barges in order to seek employment

[1] Definitions and general principles of demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

there, agreeing to give him all of the lighterage of Alfred Tucker
& Co. in the harbor of New York, and to aid him as far as possible
in securing business from other persons. The libelant agreed to
take part in the venture, and sent over the boats toward the end of
the year 1897. Mr. Tucker carried out his promise, and gave to the
libelant all of the firm's lighterage business on the waters of New
York Harbor. All of the coal dealt in by the firm at that port came
first to South Amboy, and was towed from there in the libelant's
barges either to a specified destination in the harbor, or to Morris
street wharf in Jersey City. It often happened that the barges lay
at Morris street for several days before a purchaser was found for
the coal with which they were loaded, and in some instances the
delay was as long as several weeks. In February, 1898, after one
of the barges had been thus detained for about six weeks, the libelant
wrote a letter to Mr. Tucker, complaining of the delay, and declaring
that he would charge demurrage. In consequence of this letter, an
interview took place between the libelant and Mr. Tucker, in which
explanations were made that satisfied the libelant, so that he with-
drew his claim for demurrage, and never afterwards made any claim,
either for demurrage or for damages, on account of the detention
of any other of his barges. On the contrary, bills for the use of the
barges and for such other services as the libelant might have ren-
dered were sent in regularly every month, and were regularly paid
by Mr. Tucker, without a word being said upon the subject of de-
murrage or of damages for unreasonable detention. Mr. Tucker
died in March, 1899, and early in July of that year the present claim
for demurrage and damages for unreasonable detention, amounting
to about $17,000, was for the first time presented.

The libelant alleges that the cargoes carried by the barges, until
the 1st day of July, 1898, were shipped upon a bill of lading con-
taining the following clause:

"And 24 hours after the arrival at the above-named port and notice thereof
to the consignee named there shall be allowed for receiving said cargo at
the rate of one day, Sundays and legal holidays excepted, for every one
hundred and fifty tons thereof, after which the cargo, consignee, or as-
signee shall pay demurrage at the rate of six cents per ton per day, Sundays
and legal holidays not excepted, upon the full amount of cargo, as per bill
of lading, for each and every day's detention, and pro rata for parts and
portions of a day beyond the days above specified, until the cargo is fully
discharged; which freight and demurrage shall constitute a lien upon
said cargo. After arrival and notice to the consignee as aforesaid, and the
expiration of said 24 hours, said vessel shall have precedence in discharging
over all vessels arriving or giving notice after her arrival, and for any
violation of this provision he shall be compensated in demurrage as if,
while delaying by such violation, her discharge had proceeded at the rate
of three hundred tons per day."

—And alleges further that on or about July 1, 1898, this bill of lading
was given up, and another was substituted, in which there was no
provision concerning demurrage. The first part of the libelant's
claim is for demurrage under the foregoing clause upon cargoes
carried between December, 1897, and July, 1898, but I am unable to
find that this part of the claim is sufficiently supported by the evi-
dence. Only one bill of lading, dated in February, 1898, was pro-

duced' containing the clause in question, and the testimony concerning the use of similar bills to 'cover the other cargoes carried during that period does not satisfy me that such bills were used upon other occasions. Upon this point, therefore, I think the libelant's proof has failed, except with regard to the single bill of lading just referred to; and, so far as this cargo is concerned, since a charge for the services rendered by the barge was paid in full early in the following month without any demand being made for demurrage, I am of opinion that the claim now urged is an afterthought, and should not be allowed. With regard to the cargoes carried after July 1, 189c, the bills of lading are produced, and, as I have already said, they contain no provision on which a claim for demurrage can be rested.

Concerning the claim for unreasonable detention, which is confined by the libel to cases where the bills of lading did not contain a demurrage clause, I think the true state of affairs was this: The firm of Alfred Tucker & Co. was about to begin a new enterprise in New York. The libelant saw an opportunity to extend his own business, and, upon the promise of the firm—which was faithfully carried out—to furnish him with such lighterage as they might be able to control or influence, he joined in the venture. The customary method of conducting the business must have been known to both parties. According to the usual course of the trade, coal intended for steamships lies in barges at Morris street wharf, awaiting transfer to such vessels as may have purchased, or may desire to purchase; and necessarily there must sometimes be delay. Arrival of the particular vessel for which the coal is destined may be delayed by storms; loading and unloading may not be prompt; or perhaps the coal may not yet have been sold, and a purchaser may not readily be found at once; and other reasons preventing prompt unloading of the barge may exist. The risk of delay, I think, the libelant must be held to have taken. Not only is there no sufficient evidence that Alfred Tucker & Co. were to take this risk,—except in the case of the one bill of lading already referred to,—but the testimony as a whole distinctly indicates, in my opinion, that the libelant was to make no claim for detention of his barges. The bills of lading that are shown to have been in use after July 1, 1898, establish satisfactorily to my mind what the relation between the parties was from the beginning. As there is no testimony whatever to explain why there should have been a change of relation upon July 1st, I cannot avoid the conclusion that no change was actually made, and that the bill of lading used after that date represents truly the agreement under which the business before that date was also done. Further than this, the monthly statements that were rendered by the libelant and paid by the firm without a word concerning demurrage or damages for detention (save upon the one occasion already referred to) compel the inference that the libelant was well aware that he had no right to charge for delay. Ordinary good faith and fair dealing would have required him to make such claim known during the currency of the business, especially when the large amount involved is taken into account. To keep silence until after Mr. Tucker's death is a circumstance that tends to throw strong doubt upon the correctness of the claim, and requires

it to be proved by testimony of a convincing character. I do not find such testimony in the record,—even the libelant's own books contained no entry supporting the claim until several months after the death of Mr. Tucker, when the whole account was entered at one time,—and therefore, without further 'elaboration, my conclusion is that the claim lacks adequate support, and that the libel must be dismissed, at the costs of the libelant.

I may add that the libelant was clearly incompetent to testify to anything that occurred in Mr. Tucker's lifetime, except to give in rebuttal his own version of what may have taken place with Mr. Murdock, and with this exception his testimony should not be considered.